<u>**PUBLISH**</u>

**September 5, 2012**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

IMPACT ENERGY RESOURCES, LLC;
PEAK ROYALTY HOLDINGS, LLC;
QUESTAR EXPLORATION AND
PRODUCTION COMPANY,

     Plaintiffs–Appellants,

UINTAH COUNTY; CARBON
COUNTY; DUCHESNE COUNTY,

     Plaintiffs,

v.

KEN SALAZAR, in his official capacity
as Secretary of the Department of the
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
KENT HOFFMAN, in his official
capacity as Deputy State Director for
Minerals, Utah Bureau of Land
Management of the Department of the
Interior; UNITED STATES BUREAU OF
LAND MANAGEMENT, Utah State
Office,

     Defendants–Appellees.

NATIONAL PARKS CONSERVATION
ASSOCIATION; NATIONAL TRUST
FOR HISTORIC PRESERVATION;
SOUTHERN UTAH WILDERNESS
ALLIANCE; NATURAL RESOURCES
DEFENSE COUNCIL; WILDERNESS

Nos. 11-4043 & 11-4057

SOCIETY; SIERRA CLUB; UTAH
RIVERS COUNCIL; GREAT OLD
BROADS FOR WILDERNESS; GRAND
CANYON TRUST,

   Defendants–Intervenors–
   Appellees.

RED ROCK FORESTS,

   Defendant–Intervenor,

------------------------------

WESTERN ENERGY ALLIANCE,

   Amicus Curiae.

**Appeal from the United States District Court
for the District of Utah
(D.C. No. : 2:09-CV-00435-DB)**

Michael L. Beatty, Beatty & Wozniak, P.C. Denver, Colorado, and Mark Ward, Utah Association of Counties, Murray, Utah, (Robert S. Thompson, III, Beatty & Wozniak, P.C., Denver, Colorado, on the briefs) for the Plaintiffs-Appellants.

Robin Cooley, Earthjustice, Denver, Colorado (Steven Bloch and David Garbett, Southern Utah Wilderness Alliance on the briefs), for the Defendants-Intervenors-Appellees.

Vivian H.W. Wang, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., (Ignacio S. Moreno, Assistant Attorney General, David C. Shilton, Tyler Welti, and Charles R. Scott, United States Department of Justice, on the brief) for Defendants-Appellees.

Kent Holsinger and Laura L. Chartrand, Holsinger Law, LLC, Denver, Colorado, filed a brief for Amicus Curiae Western Energy Alliance on behalf of Plaintiffs-Appellants.

Before **LUCERO**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

_____

**PER CURIAM**.

_____


Appellants in this case are companies that submitted high bids on certain oil and gas leases at a Bureau of Land Management ("BLM") auction (collectively, the "Energy Companies"). After the auction but before the leases were issued, newly appointed Secretary of the Interior Ken Salazar decided not to lease the parcels at issue. Salazar announced his decision at a February 4, 2009, press conference and memorialized his determination in a February 6 memorandum to the BLM's Utah State Director. On February 12, 2009, a subordinate BLM official mailed letters to the high bidders indicating that the leases would not be issued. Exactly ninety days later, the Energy Companies filed suit challenging the Secretary's authority to withdraw the leases. The district court dismissed their suit as time-barred under the Mineral Leasing Act ("MLA"), which provides that "[n]o action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2.

A majority of the panel agrees with the district court that the Secretary's final decision in this matter occurred no later than February 6, and thus, the suit is time-barred. As explained in their separate concurrences, however, the panel majority would employ somewhat differing analyses in reaching this result. Judge Lucero would hold that under the plain text of the MLA, the Secretary's decision was final on February 6 regardless of

whether plaintiffs' claims under the Administrative Procedure Act ("APA") had accrued at that time. Judge Seymour would hold that the word "final" bears the same meaning in the phrase "final decision of the Secretary," 30 U.S.C. § 226-2, as it does in the phrase "final agency action" under the APA, 5 U.S.C. § 704, and that final agency action occurred no later than February 6. Judge Tymkovich agrees with Judge Seymour's conclusion that final agency action is necessary, but disagrees with the majority's conclusion that the suit is time-barred as explained in his dissent.

The panel majority also agrees with the district court that the Energy Companies are not entitled to equitable tolling in this matter. The BLM notified the high bidders just six days after the Secretary made his decision. And the government notified the Energy Companies of its position that February 6 was the operative date during agency proceedings. Although the Energy Companies had time to prepare their claims before the limitations period expired, they gambled that a court would accept their proffered limitations theory. Equitable tolling is not required under these circumstances. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

On November 4, 2008, the BLM announced that it would hold a competitive auction of oil and gas leases on certain federal lands in Utah. The auction was scheduled for December 19, 2008. The National Park Service objected to the decision to lease many of the parcels, and after consulting with that agency, the BLM revised its auction to include 132 rather than 241 parcels as originally planned.

Several environmental organizations, including intervenor Southern Utah Wilderness Alliance ("SUWA"), filed administrative protests of the proposed lease sales. The notice of auction informed potential bidders that the BLM could not actually issue any leases until such protests were resolved. It stated that protested leases would nonetheless be auctioned and that the high bidder would be refunded any monies paid in the event that a parcel was withdrawn as a result of an administrative protest. Shortly before the scheduled auction, SUWA and other conservation groups filed suit in the D.C. District Court seeking to halt the planned sale. See S. Utah Wilderness Alliance v. Allred, 2009 U.S. Dist. LEXIS 30664, at *4 (D.D.C. Jan. 17, 2009) (unpublished).

On December 19, 2008, the auction went forward as planned and the BLM accepted bids on 116 lease parcels. The Energy Companies were recognized as high bidders for several of these parcels—thirty-six of which are located in counties that were also parties to this action below. Subsequently, the BLM recognized the appropriate high bidders and accepted payment for the parcels, with the express caveat that the leases could not actually be issued until all protests were resolved.

On January 17, 2009, the D.C. District Court granted a temporary restraining order prohibiting the BLM from issuing leases on 77 parcels, including those for which the appellants were the highest bidders. See S. Utah Wilderness Alliance, 2009 U.S. Dist. LEXIS 30664, at *9. It found that the environmental groups were likely to succeed on their claims under the National Environmental Policy Act ("NEPA") because the government did not conduct a proper air quality analysis. Id. at *7. The court further

concluded that the environmental groups were likely to prevail on their National Historic Preservation Act and Federal Land Policy and Management Act ("FLPMA") claims because the BLM failed to consider impacts on historic resources. Id. The court made the restraining order effective "until further order of the court" and ordered the parties to submit briefing on a preliminary injunction. Id. at *9.

Newly-appointed Secretary of the Interior Ken Salazar essentially mooted the D.C. District Court dispute shortly thereafter. On February 4, 2009, he held a press conference to announce that the 77 parcels subject to the temporary restraining order would not be leased. He stated: "I have directed [the BLM] not to accept bids on the 77 parcels" and that the "effect will be immediate . . . . This is a directive to the BLM therefore the lease process will not go forward." He further explained, "[W]hat essentially I have done is to have removed the 77 parcels from the consummation of a lease." On the same day, the Department of the Interior issued a press release announcing Salazar's decision on its website, stating:

> In its last weeks in office, the Bush Administration rushed ahead to sell oil and gas leases at the doorstep of some of our nation's most treasured landscapes in Utah. We need to responsibly develop our oil and gas supplies to help us reduce our dependence on foreign oil, but we must do so in a thoughtful and balanced way that allows us to protect our signature landscapes and cultural resources . . . . We will take a fresh look at these 77 parcels and at the adequacy of the environmental review and analysis that led to their being offered for oil and gas development. I am also concerned that there was inadequate consultation with other agencies, including the National Park Service.

The announcement was covered extensively in both the regional and national press. See, e.g., Amy Joi O'Donoghue, Salazar Halts Sale of Utah Oil, Gas Leases, Deseret News,

Feb. 5, 2009; Mark Jaffe, <u>Utah Energy Leases Halted</u>, Denver Post, Feb. 5, 2009; Leslie Kaufman, <u>Interior Secretary Cancels Drilling Leases on Public Lands in Utah</u>, N.Y. Times, Feb. 5, 2009.

The following day, February 5, the federal defendants in the D.C. District Court case filed an unopposed motion to stay briefing on the preliminary injunction question. They stated: "On February 4, 2009, Ken Salazar . . . directed the BLM not to accept the bids on the 77 parcels that are the subject of this Court's temporary restraining order. Accordingly, those leases will not be issued." When this motion was filed, Carbon County—a plaintiff in the action at bar—was a party in that case. Several attorneys that now represent the Energy Companies had entered an appearance and also received this filing.

Also on February 5, the BLM's Utah State Director issued an "Information Memorandum for the Secretary." The memo stated, "On February 4, 2009, Secretary of the Interior Ken Salazar announced the decision to withdraw oil and gas leases offered on 77 parcels . . . . A written decision withdrawing the leases will be needed to document the process." The State Director indicated that once her office received the "officially documented decision from the Secretary," it would begin the process of refunding the payments received from winning bidders.

Secretary Salazar signed and issued a memo to the BLM's Utah State Director the following day, February 6, stating:

> There has been considerable controversy surrounding this lease sale, including questions about the degree of coordination between the BLM and

other Federal agencies, including the National Park Service, and the adequacy of the environmental review and analysis performed in connection with certain parcels as well as the underlying Resource Management Plans. . . . Given the concerns about the adequacy of the consideration[,] . . . I am directing you to withdraw the 77 parcels that were covered by the January 17, 2009, Temporary Restraining Order from further consideration in this lease sale.

In accordance with applicable laws, regulations, and agency procedures, please take all necessary actions to effectuate this withdrawal, including promptly notifying the high bidders and returning any monies received by BLM in connection with these 77 parcels.

This transmittal was not made immediately public.

On February 12, 2009, the BLM's Utah Deputy State Director sent letters via certified mail to the high bidders on the 77 leases explaining that the parcels had been withdrawn. The letters state that "Ken Salazar has directed the BLM to withdraw these parcels from the December 19, 2008 Oil and Gas Lease Sale." They also authorized a refund of the bidders' payments.

The Energy Companies attempted to appeal the lease withdrawals by filing an administrative appeal with the Interior Board of Land Appeals ("IBLA") on March 13, 2009. See Robert L. Bayless Producer, 177 IBLA 83 (2009). The BLM filed a motion to dismiss that appeal on March 23, 2009, on the ground that the IBLA lacks jurisdiction over any decision "approved by the Secretary." 43 C.F.R. § 4.410(a)(3) (withdrawing IBLA authority if "a decision has been approved by the Secretary"). In its motion, the BLM took the position that the appeal sought review of the "February 6, 2009 Decision of the Secretary." It states that "appellants attempt to appeal BLM's February 12, 2009 letters. However, the BLM letters merely implement the Secretary's February 6, 2009

decision to withdraw the subject parcels from further consideration in the December 19, 2008 oil and gas lease sale." The February 6 transmittal was attached to the motion.

The IBLA granted the motion and dismissed the appeal on April 9, 2009. Robert L. Bayless Producer, 177 IBLA at 85. Its order of dismissal states: "On February 12, 2009, BLM issued decisions related to 53 of those parcels from which this appeal is taken." Id. at 84. However, the order acknowledged the BLM's position that the agency letters "merely implement the Secretary's directive." Id. The IBLA order characterizes the appellants as expressing some confusion as to the relevant date, noting that "they received no decisions other than those that BLM issued on February 12, so it was not clear to them whether BLM's decision or the Secretary's February 6 memorandum was final agency action under the Administrative Procedure Act." Id. Because the Secretary "specifically directed BLM to take a particular action," the IBLA concluded it lacked jurisdiction over the appeal. Id. The IBLA rejected appellants' request for an "opinion as to whether the Secretary's memorandum constitutes 'final' administrative action for purposes of judicial review" because it "do[es] not issue advisory opinions regarding matters in an appeal that we have no authority to consider." Id. at 85.

On May 13, 2009, appellants filed suit against Salazar, the Department of the Interior, the BLM, and the BLM's Deputy Director for Minerals in the District of Utah, challenging the decision to withdraw the leases as violations of the MLA, APA, and FLPMA. Several environmental groups intervened on behalf of the government.

The district court dismissed the action as time-barred. It concluded that the "final

decision of the Secretary" as that phrase is used in 30 U.S.C. § 226-2 was Salazar's February 6 transmittal. And because plaintiffs did not file suit within ninety days of that decision, they did not fit within the MLA's limited waiver of sovereign immunity. The court further concluded that plaintiffs were not entitled to equitable tolling and accordingly entered judgment in favor of the defendants. The Energy Companies now appeal.

## II

We review a district court's dismissal based on sovereign immunity de novo. See Governor of Kan. v. Kempthorne, 516 F.3d 833, 841 (10th Cir. 2008). "Sovereign immunity protects the United States and its agencies from being sued without their consent." Poche v. Joubran, 644 F.3d 1105, 1108 (10th Cir. 2011). "[T]he party asserting jurisdiction bears the burden of proving that sovereign immunity has been waived." Sydnes v. United States, 523 F.3d 1179, 1183 (10th Cir. 2008) (citation omitted).

Plaintiffs in this case invoke the limited waiver of sovereign immunity provided for in the APA. Under that provision, aggrieved parties may challenge "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. However, the APA prohibits review of agency decisions "to the extent that . . . statutes preclude judicial review." 5 U.S.C. § 701(a). The MLA includes such a prohibition: "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or

-10-

taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2. This statutory deadline constitutes "a condition to the waiver of sovereign immunity and thus must be strictly construed." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94 (1990).[1]

The Energy Companies ask that we look to several provisions of the APA in determining when the limitations period began to run. First, they argue that the APA's notice provision supersedes the MLA's statute of limitations such that the limitations period began to run when they received actual notice of the Secretary's decision. They point to the APA's requirement that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding." 5 U.S.C. § 555(e). They further note that the "APA governs agency procedures in all administrative proceedings," Friends of the Bow v. Thompson, 124 F.3d 1210, 1214 (10th Cir. 1997), and that a statute cannot supersede the APA "except to the extent that it does so expressly," 5 U.S.C. § 559.

Neither the APA nor the MLA suggest that the latter's statute of limitations is bound by the former's notice provision. Congress can, and often does, elect to begin a limitations period when a party receives notice. See, e.g., 42 U.S.C. § 1395oo(f)(1)

---

[1] In Geosearch, Inc. v. Hodel, 801 F.2d 1250, 1252 (10th Cir. 1986), we held that the MLA's statute of limitations is jurisdictional. We overruled Geosearch on other grounds in Reppy v. Department of the Interior, 874 F.2d 728, 730 n.5 (10th Cir. 1989), noting that a recent Supreme Court case might undermine Geosearch's jurisdictional holding. For purposes of this case, whether the statute of limitations is jurisdictional is immaterial because the government moved to dismiss based on the statute of limitations.

(permitting "civil action commenced within 60 days of the date on which notice of any final decision by the Board . . . is received"). But the MLA's limitations period is not notice-based. The MLA very clearly starts the clock on the date of "the final decision of the Secretary," 30 U.S.C. § 226-2, not when notice of that decision is received.

There is no textual basis to conclude that a violation of the APA's notice requirement warrants an alteration of another statute's unambiguous limitations provision. APA claims are generally covered by the six-year limitations period contained in 28 U.S.C. § 2401(a). See Smith v. Marsh, 787 F.2d 510, 512 (10th Cir. 1986). Consistent with the plain text of that statute of limitations, we have held that APA claims must be brought within six years of the claim's accrual rather than within six years of notice.[2] See id.; see also 28 U.S.C. § 2401 (actions against the United States must be filed "within six years after the right of action first accrues"). In other words, the limitations provision in 28 U.S.C. § 2401, not the APA's notice provision, determines the limitations start date in the usual APA case. The Energy Companies give us no reason to treat the interaction of § 555(e) and the MLA's statute of limitations differently. Notice may be relevant to the issue of equitable tolling, see Part III infra, but it does not alter the

---

[2] Accrual and actual notice dates are often identical, but diverge with some frequency. See, e.g., Sterlin v. Biomune Sys., 154 F.3d 1191, 1197 (10th Cir. 1998) (a limitations period did not begin "when a plaintiff has full knowledge of the existence of a claim" but "when a plaintiff is placed on 'inquiry notice'" (quotations omitted)). In this case, for example, the Energy Companies argue that their claims accrued on February 12, when the BLM mailed its letters. But the Energy Companies presumably received those letters a day or two later.

-12-

date the limitations period begins to run.[3]

The Energy Companies further argue that the MLA's statute of limitations could not have begun to run until the BLM engaged in "final agency action" under the APA. See 5 U.S.C. § 704. They note that their claims arose under 5 U.S.C. § 704, and accordingly could not have been filed until the final agency action requirement was satisfied. They contend there was no final agency action until the BLM sent the February 12 letters notifying them that the leases had been withdrawn.

As noted supra, the panel majority disagrees that the statute of limitations did not begin to run until the February 12 letters were sent. Rather, they agree that the limitations period began to run by February 6. Judge Lucero would hold that the "final decision of the Secretary" occurred on February 6 regardless of whether "final agency action" also occurred on that date. Judge Seymour would construe the two phrases synonymously, and would hold that both the Secretary's decision and the agency action

---

[3] The Energy Companies argue that the six-day delay between the Secretary's decision and the mailing of the BLM's notice letters violated their right to procedural due process. They raised this issue for the first time in a Rule 59 motion, and the district court declined to consider it, citing the rule that post-judgment motions are not appropriate vehicles to "advance arguments that could have been raised in prior briefing." Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). We agree with the district court that the Energy Companies failed to raise this issue at the appropriate time and have thus waived appellate review. See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1270-71 (10th Cir. 2000) (appellate review waived "[w]hen an issue has not been properly raised below").

-13-

were final by February 6.[4] Accordingly, we affirm the district court's conclusion that the Energy Companies' suit is time-barred.

## III

In addition to concluding that the Energy Companies' suit was filed out of time, a majority of the panel agrees that equitable tolling is not appropriate under the facts of this case. The district court also concluded that the Energy Companies were not entitled to equitable tolling. We review that determination for abuse of discretion. See Robinson v. Golder, 443 F.3d 718, 720 (10th Cir. 2006). Equitable tolling is granted sparingly. We have held that tolling is appropriate "when the defendant's conduct rises to the level of active deception; where a plaintiff has been lulled into inaction by a defendant, and likewise, if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights." United States v. Clymore, 245 F.3d 1195, 1199 (10th Cir. 2001) (quotation and alteration omitted).

In arguing that tolling is appropriate, the Energy Companies rely heavily on Turner v. Watt, 566 F. Supp. 87 (D. Utah 1983). Their reliance, however, is misplaced. The plaintiff in Turner sought to appeal the denial of his application for an oil and gas lease under the MLA. Id. at 88. He filed an appeal with the IBLA but temporarily left the country while the appeal was pending. Id. When the IBLA rejected his appeal, it

---

[4] In his separate opinion, Judge Tymkovich agrees with Judge Seymour that the "final decision of the Secretary" was "final agency action" in this case, but does not agree that the decision became final before February 12.

erroneously sent a notice to plaintiff's previous address even though plaintiff had filed a notice of change of address. Id. Plaintiff learned of the decision when he returned to the country after the limitations period had expired. Id. The district court held: "Because of the agency's error, plaintiff did not receive notice of the board's final decision. He was entitled to rely on the statute's requirement that it be given, and the running of the period for appeal should not begin until notice is sent in accordance with the statute." Id. at 89.

To the extent the Turner court interpreted the MLA's limitations period as beginning when a party is notified of the Secretary's decision, we reject such an interpretation for the reasons stated in Part II: The plain text of the MLA does not permit a notice-based construction. The Turner decision can be read, however, as tolling the limitations period because plaintiff did not receive notice of the IBLA decision until after the limitations period had run. In the event that an agency fails to notify a claimant of its decision until after a limitations period has expired, equitable tolling would clearly be appropriate. See Bowen v. New York, 476 U.S. 467, 481 (1986) ("Where the Government's secretive conduct prevents plaintiffs from knowing of a violation of rights, statutes of limitations have been tolled until such time as plaintiffs had a reasonable opportunity to learn the facts concerning the cause of action." (quotation omitted)).

This case also differs from Turner in an important manner. In Turner, the plaintiff did not learn of the decision until after his limitations period had expired due to agency error. In this case, the agency promptly notified the Energy Companies of the Secretary's decision but a few days into the limitations period. We rejected a request for equitable

tolling under similar circumstances in Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith, 477 F.3d 1155 (10th Cir. 2007). There, plaintiff was subject to a three-month limitations period beginning on the date he received an arbitrator's decision. Id. at 1158. Two months into that term, he received notice that the arbitrator had lost all of the evidence submitted in the proceeding. Id. at 1157. Plaintiff filed a claim beyond the limitations period based on the lost evidence and we rejected his request for equitable tolling because the plaintiff

> could have served the defendants before the expiration of the three-month time limit. He had approximately one month left after he learned that the evidence was no longer available in order to timely file his motion to vacate, but he did not file it within that time period. The one-month time period provided [plaintiff] ample opportunity to serve the defendants in a timely fashion. Thus, equitable tolling does not apply.

Id. at 1158. Similarly, the D.C. Circuit routinely denies equitable tolling unless a delay in notification "makes it impossible reasonably for the party to comply with the filing statute." Gardner v. FCC, 530 F.2d 1086, 1091 n.24 (D.C. Cir. 1976).

When the Energy Companies received notice that their leases would not be issued, more than 80 days remained in their limitations periods. As in Pfannenstiel, they had "ample opportunity" to file their claims in a timely manner. 477 F.3d at 1158. They do not claim that the six-day delay between the Secretary's decision and the BLM's mailings meaningfully limited their ability to comply with the MLA's statute of limitations.

Despite their receipt of notice a few days into the limitations period, the Energy Companies protest that they were unaware of the February 6 memo until it was served in the IBLA appeal with 45 days remaining in the limitations period. We note that 45 days

-16-

is still longer than the thirty days approved in Pfannenstiel, but can certainly imagine a case in which a plaintiff is made aware of a decision but kept in the dark as to the precise date the decision was made. And we agree that equitable tolling might be appropriate if such a plaintiff missed the filing deadline based on ignorance of the date of decision. This hypothetical plaintiff would qualify for equitable tolling because he would have "been lulled into inaction by a defendant." Clymore, 245 F.3d at 1199.

In the case at bar, however, the government fully apprised the Energy Companies of its position on the limitations period. In the IBLA proceedings, the government explicitly stated that February 6 was the operative date. Consistent with this position, it challenged the Energy Companies' reliance on the February 12 letters, arguing that "the BLM letters merely implement the Secretary's February 6, 2009 decision to withdraw the subject parcels." The Energy Companies confessed confusion as to "whether BLM's decision or the Secretary's February 6 memorandum was final," Robert L. Bayless Producer, 177 IBLA at 84, but the IBLA could not comment on that issue citing the bar on "advisory opinions regarding matters in an appeal that we have no authority to consider," id. at 85.

Thus, it is undisputed that the government communicated to the Energy Companies its position that February 6 was the date of the Secretary's decision, and the companies acknowledged the possibility that the government's position would hold sway. See id. at 84-85. Despite this knowledge, the Energy Companies gambled. They filed suit exactly 90 days after February 12, risking their claims on the court's acceptance of

-17-

their limitations theory.  This gamble did not pay off, and equitable tolling does not forgive "a garden variety claim of excusable neglect."  <u>Irwin</u>, 498 U.S. at 96.  We conclude the district court appropriately exercised its discretion by denying equitable tolling.

**IV**

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

Nos. 11-4043 & 11-4057, Impact Energy Resources, LLC v. Salazar

**LUCERO**, J., concurring.

The MLA provides, plainly and unambiguously, that "[n]o action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2. This restriction constitutes a condition on the United States' waiver of sovereign immunity and must be strictly construed. Although my colleagues are led by the Energy Companies to import principles of final agency action from the APA, I view the final agency action issue as a needless diversion leading my colleagues on a wild goose chase for ambiguity that does not exist in the phrase "final decision of the Secretary." Id.

From a policy perspective, my colleagues make a sound point. The notion that a statute of limitations may start running before a cause of action accrues appears improper on its face. If writing on a blank slate, I may well have adopted the rule the Energy Companies' implicitly propose. But the Supreme Court has closed that door. In Dodd v. United States, 545 U.S. 353 (2005), the Court was confronted with a statute's unambiguous pronouncement as to the beginning of a limitations period and held that the plain text must be honored even if it "would make it possible for the limitations period to expire before the cause of action accrues." Id. at 360. Although the Court acknowledged "the potential for harsh results in some cases," it held that courts "are not free to rewrite the statute that Congress has enacted" when a statute "clearly specifies the date on which the limitation period begins to run." Id. (quotation omitted).

Following that directive, I conclude that the "final decision of the Secretary" in this case occurred on February 6, 2009—the date of the Secretary's last involvement in this matter. Whether "final agency action" also occurred on that date is irrelevant.

**I**

As with any statute, the starting point of our sovereign immunity analysis "must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." FTC v. Kuykendall, 466 F.3d 1149, 1154 (10th Cir. 2006) (quotation omitted). However, a waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied. Moreover, a waiver of the [g]overnment's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Iowa Tribe of Kan. & Neb. v. Salazar, 607 F.3d 1225, 1236 (10th Cir. 2010).

The district court's decision that the MLA bars all of the Energy Companies' claims is well-founded on the statute's plain text. Although the Energy Companies argue strenuously that the final decision of the agency did not occur until the February 12 letters were sent, the MLA speaks of the "final decision of the Secretary." 30 U.S.C. § 226-2 (emphasis added). Whether the February 6 memo would qualify as final agency action is a difficult question. My colleagues expertly lay out the arguments on both sides of this issue. Despite the Energy Companies' emphasis on the final agency action issue, however, I see no reason to decide whether the February 6 memo qualifies.

Implicit in appellants' argument is the premise that the MLA's statute of limitations could not begin to run until their cause of action under the APA accrued. But

this is not necessarily so. It is true that a "limitations period ordinarily does not begin to run until the plaintiff has a complete and present cause of action." Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 195 (1997) (quotation omitted). In accordance with this norm, many federal statutes explicitly run from the date a claim accrues. See, e.g., 26 U.S.C. § 7433(d)(3) ("[A]n action to enforce liability created under this section may be brought without regard to the amount in controversy and may be brought only within 2 years after the date the right of action accrues."); 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ."). And the Supreme Court has acknowledged the "default rule that Congress generally drafts statutes of limitations to begin when the cause of action accrues." Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel Wilson, 545 U.S. 409, 418 (2005); see also Reiter v. Cooper, 507 U.S. 258, 267 (1993).

However, the link between an accrual date and the beginning of a limitations period is not absolute. In Graham County, the majority rejected the position that courts should construe statutes to align the accrual and limitations period dates "regardless of whether the text is ambiguous." 545 U.S. at 419 n.2. Instead, the Court held that this interpretive rule should be applied "to resolve that ambiguity, not to create it in the first instance." Id. Additional guidance on applying this principle was offered in Dodd v. United States, 545 U.S. 353 (2005). There, the Court held that an unambiguous limitations period start date must be followed even if it was "possible for the limitations period to expire before the cause of action accrues." Id. at 360. The Court distinguished

-3-

Graham County, noting the statute in that case was "ambiguous, justifying the Court's partial reliance on the standard rule that the limitations period commences when the plaintiff has a complete and present cause of action." Id. Despite "the potential for harsh results," the Court held, a statute that "clearly specifies the date on which the limitation period begins to run" must be given controlling effect. Id. (quotation omitted); see also Cloer v. Sec'y of Health & Human Servs., 654 F.3d 1322, 1333 (Fed. Cir. 2011) ("Congress is free to provide the 'odd result' of a cause of action that arises at a time different from the beginning of a statute of limitations.") cert. denied, 132 S. Ct. 1908 (2012).

This court has also held that a limitations period may begin to run before a plaintiff has a complete cause of action. In Salisbury v. Hartford Life & Accident Ins. Co., 583 F.3d 1245 (10th Cir. 2009), we enforced a contractual ERISA limitations period that began running prior to exhaustion of administrative remedies. See id. at 1248-49. We recognized that "a benefits claimant must pursue the administrative process to its conclusion before filing an ERISA suit," and thus a claimant could not prevail in a suit prior to exhaustion. Id. at 1249. But we rejected plaintiffs' argument that such a limitations period is unenforceable merely because it "allowed the claimant's cause of action to accrue before the end of the administrative process." Id. Noting that equitable tolling and other "[l]ess drastic remedies" could correct potential inequities caused by such a system, we joined the Seventh Circuit in ruling that such limitations period are permissible. Id. at 1248, 1249 (citing Abena v. Metro. Life Ins. Co., 544 F.3d 880, 884 (7th Cir. 2008)).

-4-

In accord with <u>Dodd</u>, I would abide the rule that if "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." 545 U.S. at 359 (quotation omitted). The MLA unambiguously starts the limitations clock when the Secretary makes a final decision, not when the BLM engages in final agency action. "It is for Congress, not this [c]ourt, to amend the statute if it believes that the interplay of [these two statutes] unduly restricts" litigants' ability to obtain relief. <u>Id.</u> at 359-60.

## II

Looking to the specific actions of the Secretary in this matter, it is clear that his decision was final when he sent the February 6 memorandum. Following that memorandum, the Secretary was wholly uninvolved in this matter. One would be hard-pressed to interpret the phrase "final decision of the Secretary," <u>id.</u>, as referring to a subordinate's transmittal of the Secretary's directive. The dissent suggests this conclusion is not entirely clear. (Dissenting Op. 8-9.) Respectfully, I disagree. We must employ the "ordinary, everyday meaning" of the MLA. <u>See</u> <u>Jonson v. Comm'r</u>, 353 F.3d 1181, 1184 (10th Cir. 2003) (quotation omitted). In everyday usage, a decision's finality does not depend on subsequent re-transmittal.

My colleagues take the position that the relevant passages of the MLA and APA must have the same meaning because both statutes require finality. (<u>See</u> Concurring Op. 2-6; Dissenting Op. 5-7.) Borrowing from the APA jurisprudence regarding finality, they suggest that the Secretary's decision could not have been final unless he took some action that "mark[ed] the consummation of the agency's decision[-]making process" and was

-5-

"one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 178 (1997) (quotations omitted).

Although I agree that the term "final" has the same meaning in both statutes—its plain and ordinary meaning—I do not agree that "agency action" and "decision of the Secretary" have identical import. The characteristics that render one event "final" are not generally applicable to all events. The school day is final, for example, when the closing bell rings. But the ringing of a bell does not signal the end of a race; races become final when the last runner crosses the finish line.

By the same token, there can be no doubt that agency action becomes final when an event marks the consummation of the agency's decision-making process. See id. But the Secretary's decision does not become final when the agency has finalized its process; the Secretary's decision is final when the Secretary has completed his decision-making process. And the Secretary completed his deliberative process on February 6. He had literally no further involvement in this matter after that date.

Similarly, the requirement that final agency action "be one by which rights or obligations have been determined, or from which legal consequences will flow," id. (quotations omitted), stems directly from the APA. That statute provides a right of action for individuals "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Until legal consequences are fixed, agency action will not qualify as final. But it does not follow that every statute using the word "final" contemplates impact on the legal rights of a litigant. One can easily envision an

-6-

agency process in which Secretarial approval precedes some formal, rights-fixing step, such as recording a deed. It may be that a trip to the recorder's office is necessary before the agency action can be considered final. But the Secretary's involvement ends before that formal step is taken, and thus his decision would be "final" under the common usage of that word.

Consistent with <u>Dodd</u>, I would apply the unambiguous meaning of the MLA and conclude that the final decision of the Secretary in this case occurred on February 6. His decision was final at that point regardless of any subsequent action by agency subordinates.

**III**

I must acknowledge that a plain-text construction of the MLA allows for severity in certain instances. But three factors mitigate the potential for unjust results. First, this case is complicated by the unusual procedural posture. In a typical case, a decision moves up the administrative chain of command; a BLM office or bureau renders a decision, and a party adversely affected by that decision may appeal to the IBLA. <u>See</u> 43 C.F.R. § 4.410. The IBLA's decision usually ends the agency's proceedings. <u>See</u> 43 C.F.R. § 4.403. In this case, however, the Secretary exercised his prerogative to step into an ongoing agency proceeding. <u>See</u> 43 C.F.R. § 4.5 (Secretary possesses the "authority to take jurisdiction at any stage of any case before any employee or employees of the Department" and the "authority to review any decision of any employee or employees of

the Department").[1]  Although the relevant rules expressly allow for such a procedure, it is unusual for the Secretary to personally decide a leasing dispute.  In the vast majority of cases, the date an MLA limitations period begins will also clearly be the date of final agency action.

Second, I note that the primary problem caused by starting a limitations period prior to a public decision is also present under the Energy Companies' proffered interpretation.  Divergent limitation and accrual dates necessarily result in the loss of some portion of a limitations period.  That is, the lag between an event triggering a statute of limitations and accrual of a claim leaves a plaintiff with something less than the full limitations period to prepare her suit.  In extreme cases, the limitations period could be consumed entirely before a cause of action accrues.  See Dodd, 545 U.S. at 360 (noting potential for "the limitations period to expire before the cause of action accrues").

But this issue also exists if we accept the Energy Companies' contention that the February 12 letters started the MLA clock.  These letters were mailed on February 12, but

---

[1]The Energy Companies argue that the Secretary has delegated the authority to manage oil and gas lease to the BLM and thus cannot issue a final decision on such matters.  See Onshore Oil and Gas, General, 48 Fed. Reg. 36,582 (Aug. 23, 1983) ("All of the Department of the Interior's non-royalty responsibilities related to the approval and supervision of operations on onshore Federal and Indian (except Osage) and oil and gas leases have been consolidated within the Bureau of Land Management.").  But this argument misunderstands agency delegation.  The Secretary's decision to empower the BLM merely allows the agency to act in the Secretary's stead; it does not render the servant the master.  See Schraier v. Hickel, 419 F.2d 663, 667 (D.C. Cir. 1969) ("[T]he Secretary does not lose his ultimate [MLA] authority because the Department officials assumed that appellant would be awarded a lease if he were found to qualify in all respects under pending regulation.").  As 43 C.F.R. § 4.5 makes clear, the Secretary has independent authority to overrule subordinate officials, and actions ordered by the Secretary himself are not administratively appealable.  See 43 C.F.R. 4.410(a).

were presumably not received until a few days later. Thus, under either party's interpretation, the Energy Companies would not have had the full 90-day limitations period to prepare their claims. This is true of every statute of limitations other than those that begin with notice. Compare 42 U.S.C. § 1395oo(f) (limitation period begins with notice) with 8 U.S.C. § 2401(b) (tort claims against the United States must be brought within "six months after the date of mailing . . . of notice of final denial of the claim by the agency"). Regardless of whether the limitations period began on February 6 or February 12, the Energy Companies logically could not have filed a claim until at least some portion of the limitations period had passed.

The dissent suggests that this analogy is inapt because mailing a letter to an affected party "serves the important goal of making statute-of-limitations disputes easy to resolve—a court need only look to a letter's postmark or an email's timestamp." (Dissenting Op. 19.) But the same is true of the Secretary's February 6 memorandum. That transmittal similarly contains an easy-to-prove date that made "it simple for the recipient to calculate the amount of time he has to challenge the decision." (Id.) I further note that the Energy Companies were made well aware of the importance of the February 6 date during agency proceedings, and had adequate opportunity to file a timely suit. The plain-text approach differs in degree from the Energy Companies' proposal, but not in kind.

Third, the parade of horribles regarding secret agency decision-making is largely mitigated by the availability of equitable tolling. As the Supreme Court explained in Irwin, we employ a "rebuttable presumption" that equitable tolling is available even

-9-

when a statute of limitations is a condition on the waiver of sovereign immunity. 498 U.S. at 95-96. Courts are thus empowered to avoid truly inequitable outcomes through tolling—a distinct issue from the proper interpretation of a statute of limitations. I am fully confident that courts will utilize this doctrine in appropriate cases to preclude agencies from playing fast and loose with limitations periods.

Although these factors help to alleviate the potential for unjust results, my views on this case rest ultimately on the clear language of the MLA. The Supreme Court has emphasized that we may not disregard the plain text of a statute that "clearly specifies the date on which the limitation period begins to run." Dodd, 545 U.S. at 360. That admonition is especially appropriate in this case because the MLA's limitation period constitutes a condition on the United States' waiver of sovereign immunity, and thus must "be strictly construed, in terms of its scope, in favor of the sovereign." Iowa Tribe of Kan. & Neb., 607 F.3d at 1236. Regardless of the various APA provisions upon which the Energy Companies rest their case, we must apply the MLA as written. Accordingly, I conclude that the limitations period began to run on February 6, when the Secretary made his final decision.

11-4043, *Impact Energy Resources v. Salazar*

**SEYMOUR**, J., concurring.

I fully join the per curiam opinion. Judge Lucero and I agree that the statute of limitations begins to run under the Mineral Leasing Act ("MLA") with the "final decision of the Secretary," 30 U.S.C. § 226-2, not when the plaintiffs receive notice required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 555(e). *See* Per Curiam Op. at 11-12. We also agree that the Energy Companies' suit was untimely because the Secretary's "final decision" occurred before February 12. Finally, we agree that the district court did not abuse its discretion by denying equitable tolling to the Energy Companies. *See id.* at 14-17.

I also agree that the phrase "final decision of the Secretary" in § 226-2 of the MLA is unambiguous. But contrary to Judge Lucero's view, it seems clear to me that when the Secretary makes a final decision for MLA purposes he is also taking "final agency action" pursuant to the APA. The word "final" bears the same meaning in the phrase "final decision of the Secretary," 30 U.S.C. § 226-2, as it does in the phrase "final agency action" under the APA, 5 U.S.C. § 704. Accordingly, I agree with Judge Tymkovich that the decision to withdraw the leases at issue in this case could not have been sufficiently "final" to trigger the statute of limitations without also being "final" for the purposes of the APA.

## A.

Judge Lucero concludes that the "final decision of the Secretary" could occur for statute of limitations purposes even if it did not constitute "final agency action." Lucero Op. at 6. In so doing, he unnecessarily complicates the MLA's statute of limitations and ignores decades of administrative law construing the word "final" in various statutes consistently with the APA.

The word "final" has a settled meaning in administrative law.[1] Agency action is "final" for purposes of the APA, 5 U.S.C. § 704, when two conditions are satisfied: "First, the action must mark the 'consummation' of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

The requirement of finality before judicial review is more than a mere formality. It acts as a restraint on unnecessary and premature judicial

---

[1] To the extent one might find the phrase "final decision of the Secretary" to be ambiguous, I would still apply the APA's definition of "final." Statutes that are *in pari materia* – dealing with the same subject matter – should be construed consistently with each other. *See Planned Parenthood of Rocky Mountains Servs., Corp. v. Owens*, 287 F.3d 910, 923 n.13 (10th Cir. 2002); *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("The rule of *in pari materia* . . . is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context."). Because the APA and § 226-2 of the MLA both concern judicial review of administrative actions, the two should be construed consistently.

intervention in administrative decisionmaking. As such, it is intertwined with the ripeness doctrine, *see Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 (10th Cir. 2001), which "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). Even when a substantive statute – instead of the APA – authorizes judicial review of agency action, there is a "strong presumption" that "judicial review will only be available when agency action becomes final." *Bell v. New Jersey*, 461 U.S. 773, 778 (1983).

When interpreting the meaning of the word "final" in statutes using that term in relation to judicial review of agencies, courts commonly apply the APA's meaning of "final." In *Whitman v. American Trucking Associations*, 531 U.S. 457, 478 (2001), the Court explained that the phrase "final action" in the Clean Air Act "bears the same meaning" as it does under the APA.[2] As Judge Tymkovich rightly points out, *Whitman* was no aberration. Federal courts

---

[2] The Clean Air Act provides for judicial review of the promulgation of various air quality regulations and other "final action[s] taken, by the Administrator" of the Environmental Protection Agency. 42 U.S.C. § 7607(b)(1). A petition for review must generally be filed "sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register." *Id.*

regularly apply the APA's meaning of "final" to other statutes using the term in relation to judicial review of agency actions and decisions. *See* Tymkovich Op. at 6-7 (collecting cases); *see also, e.g.*, *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 46-47 (1st Cir. 2009) (applying *Bennett* framework to define "final action" in Telecommunications Act of 1996); *Manufactured Housing Inst. v. U.S. Envtl. Protection Agency*, 467 F.3d 391, 397 (4th Cir. 2006) (applying *Bennett* to "final action of the Administrator" under Safe Drinking Water Act).

I see no sound reason to depart from this practice and adopt a novel definition of "final" for the MLA's statute of limitations. There is no indication in the MLA that Congress intended "final" to mean something different than it does in administrative law generally. In the absence of such indication, and given the presumption that a statute of limitations begins to run when the cause of action accrues, *see* Lucero Op. at 3 (citing *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 195 (1997)), we should interpret the MLA consistently with the APA.[3]

---

[3] Of course, the default rule that a statute of limitations runs when the cause of action accrues is not absolute. But I disagree with Judge Lucero that *Graham County* and *Dodd* push us to start the clock in this case before the cause of action accrued. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409 (2005); *Dodd v. United States*, 545 U.S. 353 (2005). Neither *Dodd* nor *Graham County* involved judicial review of agency action, and neither case sheds any light on whether the text of the MLA's statute of limitations is ambiguous. To the extent these cases are relevant, however,

Judge Lucero agrees that "final" has the same meaning in both the MLA and APA, but disputes "that 'agency action' and 'decision of the Secretary' have identical import." Lucero Op. at 6. This misses the mark. Here, the "agency action" under review *is* the "decision of the Secretary" to withdraw the leases. The APA defines "agency" to mean "each authority of the Government of the United States," 5 U.S.C. § 551(1). This certainly includes the Secretary of the Interior when he is acting for the agency, as he was in this case. Thus, a "decision of the Secretary" to withdraw oil and gas leases under the MLA constitutes "agency action" under the APA.

The text of the MLA's statute of limitations also indicates that the contested agency action is the same as the decision of the Secretary: the ninety-day limitations period applies to actions "contesting a decision of the Secretary." 30 U.S.C. § 226-2. Because "agency action" and "decision of the Secretary" refer to the same event, the latter could not be final without the former also being so.

Even if "agency action" and "decision of the Secretary" could refer to separate events, *Whitman* counsels us to place little emphasis on this distinction:

> The bite in the phrase "final action" . . . is not in the word "action," which is meant to cover comprehensively every manner in which an agency may exercise its power. It is rather in the word "final,"

---

*Graham County* counsels that Judge Lucero's recommended interpretation of 30 U.S.C. § 226-2 is to be avoided. Where "there are two plausible constructions of a statute of limitations, we should adopt the construction that starts the time limit running when the cause of action . . . accrues." *Graham Cnty.*, 545 U.S. at 419.

which requires that the action under review mark the consummation of the agency's decisionmaking process.

*Whitman*, 531 U.S. at 478 (citations and internal quotation marks omitted). Similarly, the bite in the phrase "final decision of the Secretary" is in the word "final." The statute of limitations in this case only began to run when the Secretary's decision to withdraw the leases bore the hallmarks of finality: a consummation of decisionmaking from which legal consequences flowed. *See Bennett*, 520 U.S. at 177-78.

**B.**

Applying the *Bennett* framework to the events at issue here supports the conclusion that the "final decision of the Secretary" occurred February 6 at the latest.[4] Once Secretary Salazar issued the February 6 memorandum to BLM, his decision to withdraw the leases bore sufficient hallmarks of finality to trigger the MLA's statute of limitations, 30 U.S.C. § 226-2.

First, the decision was "consummated" by February 6 at the latest. *See Bennett*, 520 U.S. at 178. Several aspects of the February 4 announcement and

---

[4] We need not decide whether the Secretary's decision was final on February 4, the date the Secretary publicly announced his decision, or February 6, the date he documented the decision in accordance with the Department's regulations. The plaintiffs' complaint was untimely regardless of whether February 4 or February 6 started the ninety-day limitations period. *See Carter/Mondale Presidential Comm., Inc. v. Fed. Election Comm'n*, 711 F.2d 279, 287 (D.C. Cir. 1983) ("We need not select between [the two possible dates], however, because the date the Committee eventually filed its petition . . . was long past the 30-day period triggered by either time.").

February 6 memorandum demonstrate that this was so. In the February 4 press release, Secretary Salazar announced that the decision had already been made. *See* App. at 50 ("I *have directed* Bureau of Land Management not to accept the bids on the 77 parcels . . . ." (emphasis added)). The announcement admitted of no hesitation and offered no indication that the decision was either "tentative or interlocutory in nature." *Bennett*, 520 U.S. at 178. It simply indicated that his decisionmaking was complete.

More importantly, the Secretary himself – not a subordinate official – made the decision to withdraw the leases. "An agency action is not final if it is only 'the ruling of a subordinate official,' or 'tentative.'" *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (quoting *Abbott Labs. v. Gardner*, 387 U.S 136, 151 (1967)). When BLM makes a leasing decision, an adversely affected party may ordinarily appeal the decision to the Interior Board of Land Appeals ("IBLA"). 43 C.F.R. § 4.410(a). The IBLA will then usually render the final decision on the matter.[5] *Id.* § 4.403(a) ("The Board's decision is final agency action and is effective on the date it is issued, unless the decision itself provides otherwise."). Where "a decision has been approved by the Secretary," however, the IBLA lacks authority to hear such an appeal. *Id.* § 4.410(a)(3).

---

[5] The Secretary has discretion to review decisions issued by the IBLA. *See* 43 C.F.R. § 4.5(a)(2); *cf. United States v. Navajo Nation*, 537 U.S. 488, 496 n.3 (2003) (interpreting § 4.5(a) as allowing the Secretary to review decisions by the Board of Indian Appeals).

-7-

In this case, the Secretary himself intervened to make the final decision. *See id.* § 4.5(a). As a result, once Secretary Salazar issued his written directive to BLM to withdraw the leases, no additional agency review was permissible under the law.[6] The Secretary's memo indicates no departure from this practice. It did not grant any discretion to BLM officials regarding the withdrawal. Instead it directed BLM to comply with the decision to withdraw the leases. *See* App. at 52 ("I am directing you to withdraw the 77 parcels . . . . [P]lease take all necessary actions to effectuate this withdrawal . . . ."). Because the Secretary's directive to BLM was unreviewable, the agency had "completed its decision-making process," *Franklin*, 505 U.S. at 797.

Second, legal consequences flowed from the Secretary's decision. When the Energy Companies were recognized as high bidders on the leases, they were informed that the issuance of the leases was contingent on resolution of any protests. As a result, the Energy Companies were on notice that their right to the leases was not absolute. When the Secretary effectively decided the protest issues and directed BLM to withdraw the leases, whatever authority BLM had to proceed

---

[6] Under the Department of the Interior's regulations, when the Secretary personally assumes jurisdiction of a case or reviews a decision made in the agency, a written decision must be issued. 43 C.F.R. § 4.5(c). On February 6, Secretary Salazar provided that written documentation of his decision by signing and issuing a memorandum to BLM's Utah State Director.

-8-

with issuing the leases evaporated.[7]  As already explained, the Secretary's decision was unreviewable, and BLM officials had no choice but to comply.  The Secretary's directive to BLM therefore conclusively determined that the leases would not be issued to the Energy Companies.

It is clear that BLM officials believed the Secretary's decision had conclusively determined the legal rights of the Energy Companies even before he committed the decision to writing on February 6.  On February 5, both the government's motion filed in the D.C. District Court and the Utah State Director's memo reflected that the Secretary had completed his decisionmaking and the leases would no longer be issued.  The February 5 memorandum requested a written decision only "to document the process."  Fed. Aple. Supp. App. at 7.  It offered no indication that the decision had not yet been made, or that BLM believed itself to be free to proceed with issuing the leases until it received the written documentation of the Secretary's decision.  By the same token, the government informed the D.C. District Court that the Secretary's decision had been made: "Accordingly, those leases will not be issued."  Fed. Defs. Unopposed Motion to Stay Briefing Schedule, *S. Utah Wilderness Alliance v. Allred*, No. 08-2187 (D.D.C. Feb. 5, 2009), ECF No. 66.  Thus, legal consequences flowed from the Secretary's directive to BLM.

---

[7] Of course, the leases were already subject to a temporary restraining order from the D.C. District Court.

Judge Tymkovich argues that the February 6 memo could not be the final agency action here because the memo did not withdraw the leases but instead anticipated that further steps would be needed to effectuate the withdrawals. *See* Tymkovich Op. at 12-13. Respectfully, I disagree. The steps that followed, including the February 12 letters to the Energy Companies, were nothing more than ministerial tasks carrying out the Secretary's directive. In these short letters, subordinate officials merely notified the high bidders that Secretary Salazar had "directed the BLM to withdraw these parcels." Aplt. Add. at 24. The letters did not provide any rationale for the withdrawal. They did not determine the legal rights of the recipients; Secretary Salazar had already definitively determined the leases would not be issued. As such, the letters do not undermine the finality of the Secretary's order to withdraw the leases. When the head of an agency conclusively renders a decision determining the rights of the parties, that decision is final notwithstanding that subordinate officials are needed to implement the decision. *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) ("If an agency has issued a definitive statement of its position, determining the rights and obligations of the parties, the agency's action is final notwithstanding the possibility of further proceedings in the agency on related issues, so long as judicial review at the time would not disrupt the administrative process." (internal quotation marks and alterations omitted)).

Judge Tymkovich's dissent also denies that the agency action could have

been final by February 6th because agency regulations require the Secretary's "written decision" to be "issued," 43 C.F.R. § 4.5(c), and, in its view, no issuance occurred until the letters were transmitted to the affected parties. *See* Tymkovich Op. at 13. Notably, however, the provision does not expressly require the "written decision" to be "issued" to the affected parties. Instead, it provides:

> If the Secretary or Director assumes jurisdiction of a case or reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued.

*Id.* Although notice is required, it is at least arguable whether the "written decision" itself must be transmitted to the affected parties.

The dissent relies on *Southern Pacific Pipe Lines, Inc. v. U.S. Dep't of Transportation*, 796 F.2d 539, 540 n.1 (D.C. Cir. 1986), to bolster its claim that the Secretary's decision was not "issued" until the February 12 letters were sent. In *Southern Pacific*, the court held that regulations were "issued" and triggered a statute of limitations when published in the Federal Register. But in reaching that conclusion, the court emphasized the "parties agree[d] that there was no public notice of the final regulations prior to their publication in the Federal Register, and that [the plaintiff] had no actual notice of the regulations prior to that date." *Id.* Here, in contrast, there was public notice of the withdrawal of leases prior to February 12, because the decision was announced publicly via press release, press conference, and on the internet. Nor was actual notice lacking; the Energy

-11-

Companies have never claimed they were unaware of the withdrawal of the leases until they received the letters. Thus, *Southern Pacific* is inapposite.

Certainly the Department of the Interior could have handled this process differently. The February 6 memorandum could have been labeled a "decision," the press release could have been issued *after* the memorandum had been sent to BLM, and the affected parties could have been told the specific date that this decision had occurred. But the agency's sloppiness does not render the Secretary's decision to withdraw the leases any less final or legally binding. *Cf. Whitman*, 531 U.S. at 479 ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."). And, as the Per Curiam Opinion explains, the issues of notice go to tolling, not to finality. *See* Per Curiam Op. at 12, 14-17.

## C.

Judge Tymkovich offers a parade of horribles that might follow from our decision that the Energy Companies' suit was untimely. *See* Tymkovich Op. at 17-19. Respectfully, I believe these concerns are unwarranted. The Secretary's decision to withdraw the leases does not remotely resemble the secret decisions and internal deliberations that the dissent fears will now trigger judicial review. The withdrawals were not made in secret. Instead, they were trumpeted through a press release, on the internet, and in news reports. The government announced

-12-

the withdrawal again on February 5 through a document filed in federal court, providing actual notice to at least one of the plaintiffs and several plaintiff attorneys. A "secret decision" by an agency could certainly raise concerns about finality and notice, but that is not the case before us. *Cf. Mesa Airlines v. United States*, 951 F.2d 1186, 1188 (10th Cir. 1991) (ALJ decision was "entered" and final when ALJ signed and dated order and made it public); *ITT World Commc'ns, Inc. v. FCC*, 621 F.2d 1201, 1209 (2d Cir. 1980) (Mansfield, J., concurring) (agency action was "final" and statute of limitations began to run when agency held public meeting and issued news release of meeting minutes notwithstanding that full opinion was not released until several weeks later).[8]

The dissent also suggests that because the Secretary might have "changed his mind," his decision was not final until effectuated by BLM. Tymkovich Op. at 15. I disagree. "[T]he mere possibility of future agency reconsideration" does not defeat finality. 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3942 (3d ed. 2008); *see, e.g.*, *Finer Foods, Inc. v. U.S. Dep't of Agric.*, 274 F.3d 1137, 1139 (7th Cir. 2001) ("The prospect that some future administrative case may (or may not) begin does not make the ongoing suspension any the less final."). The Secretary's decision to withdraw the leases and his reasons for doing so were clearly expressed in the

---

[8] Judge Mansfield's concurrence received a second vote and was controlling as to this issue.

-13-

press conference, the press release, and the memorandum. No entity within the Department of the Interior had the authority to review his decision. Agency lawyers even asked a federal court to rely on the withdrawal decision. Some speculation that Secretary Salazar would suddenly reverse course cannot defeat the finality of his decision.

In sum, by February 6 Secretary Salazar had declared in a written statement that the leases would not be issued, had publicly announced that decision, and had ordered subordinate officials to complete the ministerial steps required to effectuate withdrawing the leases from the sale. All of the hallmarks of finality were present. Because the "final decision of the Secretary," 30 U.S.C. § 226-2, occurred no later than February 6, the Energy Companies' complaint was untimely.

11-4043 *Impact Energy Resources, Inc. v. Salazar*

**TYMKOVICH**, J., dissenting.


The per curiam opinion allows the Secretary of the Interior to make a non-public final decision and start the clock on judicial review of that decision, even if the Department tells no one about it. This result cannot be what Congress intended when it subjected decisions of the Secretary under the Mineral Leasing Act (MLA) to a ninety-day judicial review period.

I agree with Judge Seymour that final agency action commences the applicable limitations period. But I disagree with both of my colleagues that the Secretary's undisclosed internal memorandum meets the test of finality. Therefore I respectfully dissent.

**I.**

First, a little background. In the early days of federal oil and gas prospecting, the Secretary of the Interior had wide discretion to grant or deny prospecting permits free from any judicial oversight. *See United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 419 (1931). Congress reaffirmed the Secretary's discretion in 1935, when it switched the prospecting system to a leasing system. *See Haley v. Seaton*, 281 F.2d 620, 624 (D.C. Cir. 1960).

In 1946, however, Congress, with the passage of the Administrative Procedure Act (APA), authorized judicial oversight of the Secretary's decisions. The default six-year statute of limitations for claims against the United States applied to leasing disputes with

the Department of the Interior. *See* 28 U.S.C. § 41(20) (1940). In 1960, responding to complaints about excessive delay in leasing decisions and to "remove a potential cloud on acreage subject to leasing," S. Rep. 86-1549 at 3317 (June 10, 1960), Congress determined that the period for challenging a leasing decision should be limited to ninety days: "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after *the final decision of the Secretary* relating to such matter." 30 U.S.C. § 226–2 (emphasis added).

## II.

Our task here is twofold: first to interpret the meaning of the statutory phrase, "*final decision of the Secretary*," and then to determine when, in this case, a final decision actually occurred. In my view, Judge Lucero's concurrence gives undue emphasis to the word "decision" while ignoring its equally-significant modifier, "final." I agree with Judge Seymour's concurrence that, for a decision to be "final," it must satisfy certain hallmarks of finality that are well-established in our precedents. But those hallmarks were not present until the Secretary's decision was issued to the affected parties on February 12, 2009.

### A. Principles of Construction

In interpreting a statute of limitations, we apply a strong presumption that the statutory period begins to run at the same time the affected party's cause of action accrues. "Congress legislates against the 'standard rule that the limitations period

-2-

commences when the plaintiff has a complete and present cause of action.'" *Graham*

*Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 418

(2005) (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*

*of Cal., Inc.*, 522 U.S. 192, 201 (1997)).  Thus, "where . . . there are two plausible

constructions of a statute of limitations, we should adopt the construction that starts the

time limit running when the cause of action . . . accrues." *Id.*  When Congress intends to

depart from this presumption, it does so "clearly." *Dodd v. United States*, 545 U.S. 353,

360 (2005) (interpreting AEDPA's statute of limitations).

Here, the cause of action is created not by the MLA itself, but by the APA.  A

cause of action accrues under the APA upon the occurrence of a "final agency action."  5

U.S.C. § 704.  Therefore, we start with the presumption that the MLA's statute of

limitations begins to run at the time of the "final agency action" in question.  But, as

Judge Lucero's concurrence points out, the MLA uses the phrase "final decision of the

Secretary" instead of "final agency action" to describe the point at which the limitations

period begins to run.  The question, then, is whether this difference in wording should be

interpreted to alter the presumption.

As Judge Lucero's concurrence rightly notes, this principle of construction is

intended only to "resolve . . . ambiguity, not to create it in the first instance." *Graham*

*Cnty.*, 545 U.S. at 418.  But as I explain further below, I conclude that the word "final"

carries an unambiguous and determinative meaning found in several of our precedents,

and thus the presumption is not strictly necessary to my analysis.  I nonetheless raise it to

-3-

emphasize that insofar as one believes there is any ambiguity in the meaning of "final decision of the Secretary," that ambiguity should be resolved in favor of the affected parties.

While Judge Lucero's concurrence likewise finds "final decision of the Secretary" to be unambiguous, it, too, invokes a principle of construction—the general proposition that "a waiver of the [g]overnment's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1236 (10th Cir. 2010). But the Supreme Court has applied the presumption that a statute of limitations runs from the time the cause of action accrues in the context of a section 1983 suit, *see Wallace v. Kato*, 549 U.S. 384, 388 (2007), despite the fact that a Congressional abrogation of state sovereign immunity, like a waiver of federal immunity, is strictly construed, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989). The Court has also relied on this presumption in the federal habeas context. *See Johnson v. United States*, 544 U.S. 295, 305 (2005) (citing *Bay Area Laundry*, 522 U.S. at 195). Our own court, too, has applied this presumption against the federal government. *See United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1210 (10th Cir. 2001).

In light of these precedents, I see no reason not to adhere to the standard presumption that statutes of limitations should be interpreted to run from the time the cause of action accrues.[1]

_____

[1] *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990), does not command otherwise. There, it was undisputed that the plaintiff missed a statutory filing deadline;

## B. *Finality*

Judge Lucero's concurrence goes on to posit that a "final decision of the Secretary" occurs whenever the Secretary has made up his mind. Thus, the February 6 memorandum must be the Secretary's final decision because, "the Secretary completed his deliberative process on February 6. He had literally no further involvement in this matter after that date." Lucero Concurrence at 6. The problem with this interpretation is that it gives short shrift to the word "final," and is sharply at odds with the way we have interpreted that word in the past.

In the context of judicial review of administrative action, "final" carries a specific meaning demarcating the point at which the agency (or secretarial) decision-making process ends and the potential for judicial oversight begins. Although courts have not had occasion to examine the meaning of "final" in the MLA context specifically, they have done so extensively with regard to the APA.

Under the APA, two conditions must be met for an agency action to be final: the action (1) must be a "consummation" of the decision-making process, and (2) "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154 at 177–78 (1997) (citations omitted). We have said, "[i]f an agency has issued a 'definitive statement of its position,

the only question was whether equitable tolling was potentially available. *See id.* at 95. I agree that equitable tolling is inappropriate in this case—though it may be worth noting that the Court in *Irwin* actually ruled in favor the plaintiff, finding that application of equitable tolling was presumptively permissible. *See id.* at 96.

-5-

determining the rights and obligations of the parties,' the agency's action is final . . . so long as 'judicial review at the time [would not] disrupt the administrative process.'" *Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) (quoting *Bell v. New Jersey*, 461 U.S. 773, 779–80 (1983)). A decision is consummated when it is "definitive, immediately effective, and directly and immediately affect[s] petitioners' daily business activities." *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 151–53 (1967)).

There is no reason to believe that Congress intended "final" as used in the MLA to have an altogether different meaning than in the APA. That the word modifies "decision of the Secretary" instead of "agency action" does not suggest otherwise. As the Supreme Court observed in finding that "final" meant the same thing in the APA as it did in the Clean Air Act:

> The bite in the phrase "final action" . . . is not in the word "action," which is meant to cover comprehensively every manner in which an agency may exercise its power. It is rather in the word "final," which requires that the action under review mark the consummation of the agency's decisionmaking process. Only if the [agency] has rendered its last word on the matter in question is its action "final" and thus reviewable.

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 478 (2001) (citations and quotation marks omitted).

Other courts have applied the APA definition of "final" to other statutes using that word in the context of judicial review. *See, e.g.*, *In re Aiken County*, 645 F.3d 428, 437 (D.C. Cir. 2011) (applying the *Bennett* framework to "final decision or action of the

Secretary" under the Nuclear Waste Policy Act); *Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Bonneville Power Admin.*, 506 F.3d 1145, 1151–52 (9th Cir. 2007) ("The [Northwest Power] Act does not specify what constitutes a 'final' agency action, so we have looked to the 'more general doctrine of finality in administrative agency law.'" (quoting *Puget Sound Energy, Inc. v. United States*, 310 F.3d 613, 624 (9th Cir. 2002))).

The Court of Appeals for the D.C. Circuit was confronted with an issue strikingly similar to the one we face here in *John Doe, Inc. v. DEA*, 484 F.3d 561, 566 (D.C. Cir. 2007). The court analyzed whether a decision of the Attorney General was "final" for the purposes of the Controlled Substances Act, which stated "any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the [D.C. Circuit]." 21 U.S.C. § 877. The court, deciding the *Bennett* finality framework applied, explicitly acknowledged the difference in wording between the Controlled Substances Act and the APA, but "s[aw] no reason . . . that the word 'final' in § 877 should be interpreted differently than the word 'final' in the APA." *John Doe, Inc.*, 484 F.3d at 566.

Likewise, I see no reason to interpret the word "final" in the MLA differently from the word "final" in the APA. Although I agree with Judge Lucero's concurrence that a "decision of the Secretary" may be metaphysically distinct from an "agency action," I do not think the distinction makes any practical difference here—for the same standards of finality apply to both.

Judge Lucero's concurrence points to *Dodd v. United States*, 545 U.S. 353 (2005), but it is not to the contrary. *Dodd* examined the statute of limitations in the Anti-

Terrorism and Effective Death Penalty Act (AEDPA), which runs from "the latest" of a number of enumerated events—none of which involve agency action or secretarial decisionmaking. *See* 28 U.S.C. § 2255(f). The particular provision at issue in *Dodd* applied a one-year statute of limitation from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." § 2255(f)(3). The question was when the limitations period began to run where the Supreme Court recognized a right in one case, and made that same right retroactively applicable in a different case more than one year later. *See Dodd*, 545 U.S. at 355. The Court ruled that the limitations period began to run on the earlier date, when the right was "initially recognized," even though it had not yet been made retroactive. *Id.* at 357. The Court "recognize[d] the potential for harsh results," but found that its disposition was "required by the text." *Id.* at 359.

*Dodd* is certainly relevant for the proposition that where the meaning of a statute of limitations is unambiguous, we must obey the text even when doing so results in the limitations period starting—or expiring—before the cause of action accrues. But *Dodd* has nothing at all to say about the meaning of "final decision of the Secretary." Judge Lucero's concurrence jumps to the conclusion that "final decision of the Secretary" occurs at the point when "the Secretary has completed his decision-making process"—as though this interpretation were obvious. Lucero Concurrence at 6. But the fact that one may, at first glance, find the phrase unambiguous does not mean one should ignore other

-8-

courts' interpretations of very similar statutory phrases.  *Cf. I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 284–85 (1987) (interpreting a statutory provision with reference to past interpretations of a similar provision in another statute); *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1181–82 (10th Cir. 2009) (same).  At a minimum, those courts' interpretations should cause one to question whether the meaning is really so clear.  *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 710 (10th Cir. 2006) ("A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses." (citation omitted)); *see also Hackwell v. United States*, 491 F.3d 1229, 1235 (10th Cir. 2007) ("[A] dictionary definition, *standing alone*, is not necessarily dispositive.").  And, as previously noted, to the extent one finds the wording ambiguous (though I do not), one should follow the presumption that the limitations period runs from the time the cause of action accrues.

Thus, to start the running of the limitations period, a "final decision of the Secretary" must bear the hallmarks of finality described in *Bennett*: consummation and legally-binding effect on the affected party.

### C.  Accrual

The parties have proposed three different dates on which the "final decision of the Secretary" could have occurred.  First, February 4, the date of Secretary Salazar's press conference.  Second, February 6, the date of Secretary Salazar's intra-agency memorandum to the BLM's Utah State Director.  Third, February 12, the date of BLM's

letters to the plaintiffs notifying them of the Secretary's decision and authorizing a refund.

Only the February 12 date comports with the finality principles discussed above.

*1. February 4 Press Conference*

The government's central contention to the district court was that a final decision was effected February 4, when Secretary Salazar held a press conference and issued a press release announcing his intent to retroactively withdraw plaintiffs' leases. Although the majority does not go so far as to wholly embrace the press release as the date of the Secretary's final decision, Judge Seymour's concurrence relies in part on the press release in concluding that the final agency action occurred, at the latest, by February 6.

The notion that a press conference could constitute a formal agency decision—let alone a "final" one—is truly extraordinary. "No court has ever found a press release to be a final agency action under the APA." *Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 289 (D.D.C. 2005). The only possible exception courts have ever considered (though never definitively ruled on) is that an agency press conference might constitute a final "sanction" under the APA insofar as it penalizes a party through adverse publicity. *See id.* (citing examples). While a press conference or press release may often accompany an important agency action, it is unheard of for an agency to claim that the press conference *itself* constitutes the legally operative, formal decision for purposes of judicial review.

The Department of the Interior's own regulations give no support to the notion

that, prior to this case, the Department ever claimed the power to rule by press conference. To the contrary, the regulations codifying the Secretary's power to review his subordinates' decisions explicitly require a "written decision." 43 C.F.R. § 4.5(c) ("If the Secretary . . . reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued.").

A press conference is fundamentally a political act, not a legal act; it serves to "express federal policy but lack[s] the force of law." *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 329–30 (1994); *see also id.* ("The Executive Branch actions—press releases, letters, and *amicus* briefs— . . . are merely precatory."). Whatever APA significance a press conference might have would be limited to the provision of notice to the public *after* an agency decision is consummated. A press conference is not a mechanism by which rights and obligations are determined, or from which immediate legal consequences flow. Thus, a press conference cannot be a final agency action.

### 2. *February 6 Intra-Agency Memorandum*

The two concurrences find that a final agency action occurred no later than February 6, when the Secretary sent the intra-agency memorandum to the BLM. According to the majority, the Secretary's memorandum did not give the BLM any discretion in carrying out the Secretary's will; thus, notifying the parties and refunding their money was simply a ministerial act.

-11-

The Secretary's February 6 memorandum to the BLM stated, in relevant part:

> There has been considerable controversy surrounding this lease sale . . . On January 17, 2009, a Federal district court issued a Temporary Restraining Order enjoining issuance of oil and gas leases for 77 of the parcels offered. Given the concerns raised . . . and my belief that the issues raised merit further review, I am directing you to withdraw the 77 parcels that were covered by the January 17, 2009, Temporary Restraining Order from further consideration in this lease sale.
>
> In accordance with applicable laws, regulations, and agency procedures, please take all necessary actions to effectuate this withdrawal, including promptly notifying the high bidders and returning any monies received by the BLM in connection with these 77 parcels.

Aplt. Br. Add. at 23.

Some observations. First, the February 6 memorandum, though it does not vest the BLM with discretion regarding whether to withdraw the parcels, does not purport to "effectuate" the withdrawal of its own force; rather, it orders the BLM to "take all necessary actions to effectuate this withdrawal." This wording suggests that on February 6 the parcels were not yet withdrawn. Second, the letter implies that to "effectuate" the withdrawal it is necessary for the BLM to take steps to notify the parties and refund their bids. Third, the letter contemplates compliance with "applicable laws, regulations, and agency procedures."

As noted above, one of the applicable regulations here is 43 C.F.R. § 4.5(c), which states: "If the Secretary . . . reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision

-12-

will be issued." Although Judge Seymour's concurrence finds the Secretary satisfied the "issued" requirement by issuing a memorandum to a subordinate, the fact that the regulation requires notice to be given to both "Department personnel" and "the parties" suggests that the "written decision" must be "issued" to the affected parties as well.[2] The D.C. Circuit, addressing a similar problem, found that, for statute-of-limitations purposes, the word "issued" referred to the date when an order was *published*, rather than the date the agency claimed it was issued. *See S. Pac. Pipe Lines Inc. v. U.S. Dep't of Transp.*, 796 F.2d 539, 540 (D.C. Cir. 1986). And our own court has approved the D.C. Circuit's understanding. *See Mesa Airlines v. United States*, 951 F.2d 1186, 1188 (10th Cir. 1991).

Judge Seymour's concurrence characterizes the agency's action as mere "sloppiness." Seymour Concurrence at 11. Be that as it may, sloppiness can and does have legal consequences. The fact that the BLM did not issue an order *to the parties* until February 12—and even then, did not notify them of the February 6 memo—is "behavior" inconsistent with a February 6 date of finality. *Whitman*, 531 U.S. at 479.

The Secretary's course of action—internally directing the BLM to effectuate the withdrawal, as opposed to declaring the parcels withdrawn—is consistent with the way the Department's regulations internally allocate authority. Under Department regulations, "[a]ll of the Department of the Interior's non-royalty responsibilities related to the approval and supervision of operations on onshore Federal . . . oil and gas leases have

---

[2] Similarly, decisions of this court are "issued" when they are made public—not when the panel sends its final draft to the clerk of court.

-13-

been consolidated within the Bureau of Land Management." 48 Fed. Reg. 36582-02, 36582. Thus, in practice, most "decision[s] of the Secretary" under the MLA are in fact decisions by BLM administrators exercising authority delegated to them pursuant to these regulations.

While the intra-agency memorandum may have been binding in the sense that it obligated the BLM to act, it was not legally binding with regard to external parties. One reality of the modern federal administrative state is that cabinet department heads act through a web of subordinates, and their actions are not effectuated legally until they are carried out by those subordinates. Another reality is that the President and Congress have much to say about agency action and may intervene before a decision is finalized.

Thus, for example, in *Justheim Petroleum Co. v. Department of Interior*, 769 F.2d 668 (10th Cir. 1985), we found that even though the Secretary had directed the BLM to issue certain oil and gas leases to an applicant, that issuance was not legally effective where Congress withdrew the Secretary's authority to issue the lease "[b]efore the BLM acted on [plaintiff's] applications." *Id.* at 671. In other words, the Secretary's command, though final in the sense that the Secretary had made up his mind, was not legally final until executed by the agency.

The structure of the administrative state necessitates that internal agency communications have no external legal effect until they are externally manifested—that is, until they are "issued." *Ctr. for Native Ecosystems*, 509 F.3d at 1329. This is why, in *Mesa Airlines*, we recognized that "[a] decision becomes a final decision when it is both

-14-

complete and *passes out of the control of the authority* by being released to the interested parties or to the public in decisional form." *Mesa Airlines*, 951 F.2d at 1188 (emphasis added). Here, although the Secretary sent a memorandum to a subordinate, that decision did not "pass[] out of [his] control . . . by being released to the interested parties" until the BLM mailed the February 12 letters. *Id.* Unlike Judge Lucero, I am not hard-pressed to interpret the phrase "final decision of the Secretary" to require a "transmittal of the Secretary's directive," for it is the act of external transmission, whether performed by a subordinate or by the Secretary himself, that consummates the decision and gives it a binding legal effect on the affected parties. Lucero Concurrence at 5.

Several counterfactuals clarify this point. Suppose that on February 11, before the letters were mailed, the Secretary had changed his mind and reversed the withdrawals before they had ever been effectuated by the BLM. Surely stakeholders could not then challenge this change on the grounds that the February 6 memorandum was a legally-enforceable agency action. So holding would prevent a cabinet official from *ever* altering a directive without exposing himself to an APA suit by an aggrieved party or interest group.

Alternatively, suppose that on February 7 the memorandum was leaked to the successful bidders. Under Judge Lucero's approach, they could not immediately bring suit against the Department of the Interior to demand a refund, because the Department had not, at that point in time, "issued a 'definitive statement of its position, determining the rights and obligations of the parties.'" *Ctr. for Native Ecosystems*, 509 F.3d at 1329.

-15-

Or suppose the Secretary told his chief of staff on February 1 that he had decided to withdraw the leases.  Isn't that decision as "final" as the February 6 memorandum?  After all, both merely communicate the Secretary's decision to a subordinate and might be the Secretary's last personal involvement in the decision.   Under Judge Lucero's logic, this conversation would trigger the limitations period.

Our precedents also suggest that in considering whether an agency action is final, we should consider the effect our decision would have on the orderly conduct of the administrative process.  *See Ctr. for Native Ecosystems*, 509 F.3d at 1329 ("[T]he agency's action is final . . . so long as 'judicial review at the time [would not] disrupt the administrative process.'"); *see also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) (issuance of an enforcement letter "crystallize[s] an agency position into final agency action within APA § 704's meaning").  Judge Lucero's interpretation of "final decision"—whenever the Secretary "ha[s] literally no further involvement in [the] matter," Lucero Concurrence at 6—would necessitate judicial intrusion into the decision-making processes of the executive branch, as parties fight over which memorandum (or press conference) constituted the "final" agency decision.  *Cf. Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) ("[O]fficials will not communicate candidly among themselves if each remark is a potential item of discovery." (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001))).

Judge Seymour's approach will lead to similar problems.  Judge Seymour refuses

-16-

to decide whether the press release or the memorandum constituted the final agency action, instead concluding that the decision was final "by February 6." Seymour Concurrence at 6. Her analysis, in essence, combines various aspects of these documents that, in her view, collectively satisfy the *Bennett* factors. But if the press conference alone was insufficient, and the memorandum was not disclosed, the result is the same as under Judge Lucero's analysis: the affected parties will have no idea when their cause of action accrues.

The per curiam opinion's holding carries at least two significant future implications.

*First*, giving legal effect to internal agency documents will likely expose agencies to judicial challenges that would today be considered unripe. "[T]he purpose of the ripeness doctrine is: 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been *formalized* and its effects felt in a concrete way by the challenging parties.'" *Sierra Club v. Yeutter*, 911 F.2d 1405, 1415 (10th Cir. 1990) (emphasis added) (quoting *Abbott Labs.*, 387 U.S. at 148–49). One of the key factors of a ripeness inquiry is "whether judicial intervention would inappropriately interfere with further administrative action." *Signature Props. Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1265 (10th Cir. 2002) (quoting *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1231 (10th Cir. 2001)). Thus, when there is a possibility (even a remote possibility) of an agency modifying a decision before

-17-

it is formalized and issued, we have found the agency's decisionmaking processes protected by the ripeness doctrine. *See Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agric.*, 197 F.3d 448, 452 (10th Cir. 1999). But after today's ruling, the government will be hard-pressed to argue, as it typically does, that its internal decisions are not final in the judicially enforceable sense; stakeholders, quite rightly, will point to today's decision as proof that press releases and internal directives are final decisions ripe for review, lest they inadvertently lose their window of opportunity to challenge the decision.

*Second*, the potential for agencies intentionally abusing the per curiam opinion's holding—by keeping "final decisions" secret for some time, or by failing to disclose the precise dates such decisions were made internally—cannot be ignored. The notion that undisclosed— even secret—documents trigger a statute of limitations is contrary to the notion of open and accountable administrative decisionmaking.

Judge Seymour's concurrence characterizes these consequences as a "parade of horribles." Seymour Concurrence at 11. But they are fully consistent with the approach taken by the majority; neither Judge Seymour's concurrence nor Judge Lucero's concurrence offer a limiting principle that would prevent these consequences, whether caused by sloppiness or intentional abuse.

Judge Lucero's concurrence claims that the equitable tolling doctrine would be sufficient to curtail such abuses. But Judge Lucero also finds—quite rightly—that equitable tolling is meant to be an extraordinary remedy, and therefore is inapplicable here. The logical implication of the majority's position is that the Secretary would have

unlimited discretion to truncate the 90-day period specified by Congress to a length of his choosing, so long as he leaves some minimal window of time—a week? three days?—for an affected party to file a slapdash legal challenge. This discretion would not be limited to the MLA; rather, it would apply to *every* limitations period that Congress has seen fit to run from the time of a final decision rather than from the time notice is transmitted or received. Allowing agencies to alter limitations periods at their discretion would largely defeat the point of these statutes—to enable meaningful judicial review of agency decisions within a well-defined time period established by Congress.

Judge Lucero's concurrence makes much of the fact that many statutes make the *transmission* of notice, rather than the *receipt* of notice, the point at which the limitations period begins to run, meaning that the time the notification spends in transit eats into the time the plaintiff has to challenge the decision. Judge Lucero reasons that because such schemes are unobjectionable, a scheme in which the limitations period is triggered by an undisclosed internal agency memorandum is likewise unobjectionable. Respectfully, I find the comparison unconvincing.

A transmission trigger serves the important goal of making statute-of-limitations disputes easy to resolve—a court need only look to a letter's postmark or an email's timestamp, rather than resolve a factual dispute regarding when the recipient actually received notice. A transmission trigger also makes it simple for the recipient to calculate the amount of time he has to challenge the decision. But a trigger based on an internal agency document muddles, rather than clarifies, the limitations period, particularly when

it is not initially disclosed to the affected party. In addition, the necessary delay created by the postal service (or other delivery provider) is not subject to the same fairness concerns as a delay created by the agency itself, whether through deliberate withholding of notice or mere negligence.

In light of these considerations, I must conclude that the February 6 memorandum did not constitute a "final agency action" under the APA or a "final decision of the Secretary" under the MLA. Even if the Secretary's decision was embodied in that memorandum, the decision was not final until it "passe[d] out of [his] control" by being externally manifested in some way. *Mesa Airlines*, 951 F.2d at 1188.

*3. February 12 letter to the plaintiffs*

Having excluded the February 4 press conference and the February 6 memorandum, we are left with the February 12 letter. This letter, unlike the press conference or the memorandum, satisfies the finality standards described in our precedents. The letter, which was sent to the plaintiffs by certified mail, stated:

> Dear [Plaintiff],
>
> [Plaintiff] was the high bidder for oil and gas leases [lease numbers] at the competitive oil and gas sale held in this office on December 19, 2008.
>
> The Secretary of the Interior, Ken Salazar has directed the BLM to withdraw these parcels from the December 19, 2008 Oil and Gas Lease Sale. Therefore, we are authorizing a refund in the amount of [amount paid] for the Bonus Bids, 1st Year's Rentals and Administrative Fees.
>
> Sincerely,
> [signature]
> Kent Hoffman

-20-

Deputy State Director
Division of Lands and Minerals

Aplt. Br. Add. at 24. The letter was dated February 12, 2009, and made no mention of the February 4 press conference or the February 6 memorandum.

The February 12 letter is a much better candidate for "final action" than either the February 4 press conference or the February 6 memorandum. The letter "consummat[ed]" the agency action through an exercise of the Secretary's delegated authority. *Bennett*, 520 U.S. at 177. It constituted a formal issuance of a "definitive statement of" the agency's position. *Ctr. for Native Ecosystems*, 509 F.3d at 1329; *see Mesa Airlines*, 951 F.2d at 1188. And it "determined the rights and obligations of the parties," *id.*—the plaintiffs lost all rights attached to their winning bids and became entitled to a refund in the amounts specified. Critically, judicial review after the February 12 letter was issued would not "disrupt the administrative process." *Id.*

This contrasts with the February 6 memorandum, which, if it were the final decision, would have necessitated the plaintiffs undertaking intrusive inquiries into internal Interior Department communications in order to effectively vindicate their rights. It also satisfies the man-in-the-street common sense test we should always keep our eye on.

\*       \*       \*

The majority's decision today is a recipe for uncertainty, unfairness, and inefficiency in the administrative process. As one of our circuits facing a similar issue

-21-

recently said:

> If we considered agency statements lacking clear indicia of finality to nonetheless be final agency action, subjects of agency regulation would be forced to file repeated precautionary petitions for review.  Such petitions would waste the time and resources of the Court and of the parties, and would promote unfairness by allowing an agency to retroactively determine whether a particular statement was final or not.  Considerations such as these have long been an integral part of finality determinations.

*Am. Airlines, Inc. v. Transp. Sec. Admin.*, 665 F.3d 170, 174 (D.C. Cir. 2011).  Such problems are amplified, of course, when the document at issue is an undisclosed memorandum.  To the list above we may add intrusive disclosure requests of internal agency documents.

Surely Congress did not intend the result the per curiam opinion reaches today, and the text of the MLA does not command such an outcome—a result at odds with well-established principles of statutory construction, applicable case law, and an orderly process of judicial review of administrative action.